**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MIICHAEL SCOTT BOWMAN,** | : | **Civil No.  1:20-CV-00900** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **ANDREW SAUL** | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.    Introduction

Disability determinations often involve evaluation of a claimant's changing medical condition over time. One critical aspect of this analysis is ensuring that material changes in the claimant's health are fully and adequately considered. Where a material change in the claimant's health is not acknowledged or evaluated, a remand is often necessary. This is particularly true in cases where the ALJ fails to offer an adequate explanation for discounting relevant medical evidence.

In the instant case, an ALJ denied a disability application submitted by Michael Scott Bowman ("Bowman"). Bowman now appeals the ALJ's denial of his disability application, in which the ALJ found that Bowman could perform a range of work at all exertional levels with some additional postural limitations, a limitation

1

as to workplace hazards, and non-exertional limitations. Specifically, the ALJ found that, although the medical records indicated that Bowman suffers from cognitive impairments and limitations in executive functioning,[1] he could perform work at all exertional levels with postural limitations, as well as limitations regarding his mental capacity.

Thus, after a review of the record, including the extensive medical history regarding Bowman's initial traumatic brain injury by a shotgun wound in 1996, as well as his subsequent closed head injury in a motor vehicle accident in 2008 and his progressive development of seizures and behavioral issues, we find that the ALJ's RFC determination is not supported by substantial evidence. Accordingly, we will order that this case be remanded for further consideration.

---

[1] Executive functioning is "the group of complex mental processes and cognitive abilities (such as working memory, impulse inhibition, and reasoning) that control the skills (such as organizing tasks, remembering details, managing time, and solving problems) required for goal-directed behavior." "Executive function." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/executive%20function (accessed 17 May 2021).

## II.  Factual Background

### A. Bowman's Medical History

Bowman filed for disability insurance benefits on January 22, 2018. (Tr. 15, 78). He was 36 years old as of the alleged onset date of September 28, 2017 and had a high school education and past work as a purchasing agent, data entry clerk, clerk typist, and auditing machine operator. (Tr. 22, 23, 230). Bowman alleged am\n array of impairments including complex partial seizure of frontal lobe, memory impairment, cognitive disorder, pure hypercholesterolemia, diabetes insipidus, and nocturnal neurosis. (Tr. 78-79, 229).

In 1996, Bowman survived a gunshot wound to the head. (Tr. 313). He was 14 years old at the time of the initial injury and remained hospitalized for the remainder of his eighth-grade school year. (Tr. 470). He returned to school the following year and attended his ninth grade classes with the use of an IEP, but the IEP was not deemed necessary after his ninth-grade school year and he continued in mainstream classes thereafter with a regular curriculum. (Tr. 406).

After graduating from high school, Bowman began working for the Turnpike Authority in 2000. (Id.) In 2008, Bowman was involved in a car accident and sustained a closed head injury, after which he began experiencing seizures in 2010. (Tr. 313).

On December 10, 2012, Bowman was brought to Hershey Medical Center by ambulance when he was found at work after experiencing a seizure, which was followed by an episode of confusion. (Tr. 323). He remained post-ictal when he arrived at the emergency department. (Id.) He was diagnosed as having suffered a grand mal seizure and was released home. (Tr. 325). In January of 2013, it was noted that Bowman's family reported that he had experienced 3 seizures since he was last seen May 2012 and that his last occurred while he was working. (Tr. 321). At that time, Bowman and his wife thought he might have missed his medication and suffered seizures as a result of missing medication, so his prescription was not changed. (Id.) His prescription for Keppra was increased to 1000 mg. (Id.)

In September of 2013, Bowman was seen at the Hersey Medical Center Department of Neurology by Claire Flaherty-Craig, PhD. (Tr. 316). He was assessed for a primary complaint of diminished work capacity and short-term memory deficits. (Id.) At the time, Bowman said he was performing well at work in his job with the Turnpike Commission. (Id.) Bowman complained, however, that his seizures had been simple staring spells until 2010 but had worsened over the last 3 years. (Id.) It was noted that Bowman had married in 2011 and was living with his wife and her 3 daughters. (Id.) On November 27, 2013, Bowman was seen again by Claire Flaherty-Craig, PhD, and he presented at the appointment with his wife. (Tr.

313). Dr. Flaherty-Craig noted that Bowman had been referred for a Neuropsychological Evaluation by CRNP McNew and that Mrs. Bowman complained that her husband would start projects and not finish them and that he was easily distracted and moved from one activity to another. (Id.) Dr. Flaherty-Craig noted that on neurobehavioral cognitive status Bowman had average orientation, attention, language, constructions and calculations but had severely deficient memory. (Tr. 317). Dr. Flaherty-Craig opined that Bowman showed:

> [A] pattern of findings for mild deficiencies of verbal short term memory disorder, consistent with his history of seizures disorder of several years duration, emerging after a 10 year lag following traumatic brain injury which may itself have been triggered by seizures. His associated physical signs when he has seizure events, including right limb weakness, are consistent with left hemisphere cognitive disruptions to vernal learning and memory.

(Tr. 317).

On December 2, 2013, the second visit for the partial Neuropsychological Evaluation was performed by Dr. Flaherty-Craig. (Tr. 313-14). Dr. Flaherty Craig administered the Weschler Memory Scale, the Dichotic Listening and Paced Auditory Serial Attention Test. (Tr. 314). Dr. Flaherty-Craig found that Bowman's auditory attention and bilateral memory capabilities were within normal ranges but noted that he should return for WAIS-IV test as well as executive functioning testing. (Id.) There is no indication in the record that the additional tests were administered.

5

On September 29, 2014, Bowman was seen by CRNP McNew. (Tr. 371-72). NP McNew's notes indicate that Bowman reported he had been seizure free for "a long time" following his appointment in August of 2013, but his wife corrected him to say that he had not had seizures for two to three months but had had one seizure per month for several months before, and that there had been a period of 3 weeks in which he not taken his medication due to his confusion over obtaining his prescription. (Tr. 371).

On March 9, 2015, Bowman was involved in a motor vehicle accident in which his car was hit from the rear. (Tr. 381). Bowman was noted to have back and neck pain and was prescribed muscle relaxers. (Id.) Bowman was diagnosed with cervicalgia. (Tr. 382).

In July of 2015, Bowman's wife contacted his medical providers complaining that he was easily agitated and would fly off the handle. (Id.) Medical providers advised Bowman's wife that this was likely not related to medication but "could very well be related to frontal lobe damage from his head trauma." (Id.) Bowman presented for an appointment accompanied by his parents. (Id.) He denied additional seizures, although his parents indicated that they believed there had been two additional seizures and that Bowman's wife was monitoring his Keppra. (Tr. 384).

On October 27, 2015, an urgent appointment was scheduled with CRNP McNew when Bowman was fired from his job as a result of "behavioral issues." (Tr. 383). Bowman was noted to be laughing and smiling and not concerned with the loss of his job. (Id.) When CRNP McNew attempted to discuss the fact that Bowman would have no income as a result, Bowman stated that he understood and CRNP McNew noted that "it had no impact on his emotions whatsoever." (Id.) CRNP McNew opined that "I do not believe that the [Keppra] itself is causing the behavioral issues, but more likely related to the frontal lobe damage that he had from the initial trauma." (Id.)

On January 28, 2016, Bowman was examined by Dr. Miller who noted that in October Bowman had lost his job as a result of anger and behavioral issues, and had been noted to also have not been bathing or changing his clothing and forgetting to eat. (Tr. 400). Bowman reported that he had not experienced any seizures since October of 2015, but his father was present and reported that he witnessed a seizure in November of 2015. (Id.)

In February of 2016, Bowman was seen at a seventy-five-minute consultative examination by Michael Ciazzo, PhD. (Tr. 402-15). On mental status examination, Dr. Ciazzo noted that Bowman's mood was euthymic, his affect full range, and his thought process goal directed. (Tr. 407). Dr. Ciazzo found Bowman's attention and

concentration to be mildly impaired and his memory skills intact. (Id.) Dr. Ciazzo opined that Bowman's insight and judgement were fair. (Tr. 407-08). Dr. Ciazzo administered a Weschler Memory Test and noted that scores in the assessed memory areas were all average. (Tr. 408-09). Dr. Ciazzo opined that based on the results of the test and "combined with his adequate executive functioning as an employee of the turnpike for many years, it would appear that his scores do not indicate a neurocognitive disorder." (Id.) Dr. Ciazzo opined that "his seizures, blackout spells and verbal outbursts may be attributable to symptomology of seizures rather than brain injury" and stated that Bowman should consult with his neurologist regarding those issues. (Id.)

On December 14, 2016, Bowman was examined by Maria T. Moran, PhD, who administered a full Neuropsychological Examination over an eight-hour period. (Tr. 470). On interview, Bowman stated that he believed he was capable of simple tasks and was not given warnings by his employers prior to being discharged. (Tr. 471). Bowman's mother was present and reported that Bowman had received written warnings that he was not completing tasks and that his last employer had provided him with one-on-one supervision. (Id.) Dr. Moran administered the following tests: TOMM; WAIS-IV; WRAT-4; Controlled Word Association Test;  Animal Naming Test;  Boston  Naming  Test;  Stroop  Color  and  Word  Test,  Trail  Making  Test;

Auditory Consonants Trigram; California Verbal Learning Test; Rey Complex Figure Test; Wisconsin Card Sorting Test; Short Category Test; Beck Depression Inventory; and Beck Anxiety Inventory. (Tr. 471). She found that general cognitive efficiency was average to low average; visual-motor integration was average; auditory-visual attention span was high average; verbal learning through repetition showed susceptibility to interference; superior immediate recall for simple visual designs, with relatively reduced retrieval following a delay; and visual problem solving was intact, with mild failure to maintain cognitive set, possibly due to inattention. (Tr. 472-73). She concluded that Bowman has largely intact cognitive function in a structured setting, but that he showed susceptibility to interference with list learning. (Tr. 473). Dr. Moran opined that there was no evidence of executive dysfunction on measures but found that "it would appear that there are behavioral issues associated with the brain injury at 14 and consequent current bifrontal encephalomacia." (Id.) She further opined that while Bowman's cognitive functioning was intact and that his performance was stable when compared to his 2013 Neuropsychological Evaluation, "[h]e was appropriate but did not engage in spontaneous interaction, suggesting some degree of initiation difficulty. He was restless throughout the evaluation as well." (Id.) She ultimately opined that "it would appear that while Mr. Bowman has appropriate cognitive ability, his frontal lobe

9

dysfunction expresses itself behaviorally. He will require structure with tasks, including assistance staying on tasks and initiating tasks. Increased structure and routine in his daily life would be helpful." (Id.)

On March 8, 2017, Bowman presented to the Neurology Department where it was noted that he had achieved good control of his seizures with Keppra, but "does have continued issues with executive dysfunction, apathy and memory." (Tr. 463). He was diagnosed with complex partial seizures; diabetes insipidus; focal epilepsy with impairment of consciousness, intractable; memory loss; refractory frontal lobe epilepsy; shaking' and traumatic brain injury ("TBI"). (Tr. 465).

In addition to the medical opinions of Dr. Moran and Dr. Ciazzo, there were medical opinions rendered by neurologists, Myron Miller, MD and Tiffany Fisher, MD, as well as Nurse Practitioner Cathy N. McNew, CRNP, and State agency consultants Molly Cowan, PsyD and Maura Smith-Mitsky, MD.

On this score, in February 2018, Dr. Fisher rendered a medical source statement. (Tr. 267-72, 568-73). Dr. Fisher had seen Bowman 3 times when she rendered the opinion. (Tr. 267, 586). She diagnosed him with localization-related symptomatic epilepsy with history of traumatic brain injury. (Id.) She stated that Bowman had complex partial seizures lasting 30 to 60 minutes, as well as memory impairment. (Id.) Dr. Fisher noted that she relied on the objective evidence of a 2008

10

EEG that had shown objective evidence of focal frontal slowing prominent on right side and consistent with cortical dysfunction. (Id.) Dr. Fisher noted that Bowman took Keppra but had breakthrough seizures. (Id.) Dr. Fisher opined that Bowman would have difficulty with "common sense things" and showed apathy. (Tr. 268, 587). Dr. Fisher further opined that Bowman had no physical limitations in sitting, standing, walking, lifting or carrying. (Tr. 268-69). Dr. Fisher stated that Bowman would have occasional interference in concentration due to seizures and constant interference due to memory impairments and that he was not capable of even performing a low stress job. (Tr. 268, 568). Dr. Fisher also opined that Bowman would have difficulty concentrating and following even simple directions; cannot drive; cannot climb ladders; cannot work at heights, with heavy machinery, or near sharp objects or open flames. (Tr. 270, 571). It was Dr. Fisher's opinion that Bowman would miss more than one day of work per month and would be off tasks at least 15% of the time. (Tr. 272, 573). Dr. Fisher noted that Bowman "consistently has difficulty staying on task." (Id.)

Dr. Miller completed a medical source statement for Bowman on January 4, 2018. (Tr. 272-78, 448-51). Dr. Miller had seen Bowman six times in the past 12 years. (Tr. 272, 448). Dr. Miller diagnosed Bowman with complex partial seizure disorder with memory impairment and executive function impairment, all resulting

from a gunshot wound to the head at age 14. (Id.) Dr. Miller stated that Bowman suffered from occasional seizures as well as memory impairment, apathy and impaired executive function. (Id.) Dr. Miller opined that Bowman's seizures would occasionally interfere with concentration and that memory issues would constantly interfere with attention and concentration and opined that Bowman lacked the ability necessary to tolerate even low stress work. (Tr. 274, 575). Dr. Miller further opined that Bowman had no physical restrictions to sitting, standing, walking, lifting or carrying, simple work tasks. (Tr. 274-76, 575-77). Dr. Miller stated that Bowman would have good days and bad days and that his memory, apathy and executive function are always impaired. (Tr. 276, 577). It was Dr. Miller's opinion that Bowman would miss more than one day of work per month. (Tr. 278, 579). He further opined that the impairments had lasted as long as he had known Bowman and likely since he was shot at age 14. (Tr. 278, 451).

Cathy McNew, CRNP opined that Bowman would not be able to go back to a full-time job. (Tr. 401). She opined that Bowman suffered from "frontal lobe syndrome" with poor memory, poor executive function, and apathy. (Id.)

On April 16, 2018, state agency psychologist, Molly Cowan, PsyD, opined that Bowman had a mild limitation in understanding, remembering or applying information; would have a mild limitation interacting with others; would have

moderate limitations in concentrating, persisting and maintaining pace; and would have moderate limitations adapting or managing himself. (Tr. 82-83).

On May 14, 2018, State agency analyst, Maura Smith-Mitsky, MD opined that Bowman should avoid exposure to hazards but found no other physical limitations. (Tr. 84-86).

At the administrative hearing, Bowman's father, Robert Bowman, Jr., appeared and testified. (Tr. 53-66). Mr. Bowman testified that with the exception of a six-month period in which Bowman lived with his wife, Bowman had lived with his father all his life. (Tr. 55). He testified that Bowman performed tasks around the house such as cutting the grass or washing the cars. (Id.) He testified that if he did not supervise or watch Bowman and direct him to do specific things, he would not do them. (Id.) Mr. Bowman stated that since 2017, Bowman's memory and attention to detail were worse and that his anger and outbursts were worsening. (Tr. 56).

Mr. Bowman stated that he worked for the school district in which Bowman had been working as a custodian. (Tr. 56). He testified that Bowman's supervisors would come to him to report that Bowman was not completing his work and asked him to speak with him. (Tr. 57). He further testified that at times he was Bowman's supervisor and at other times he was present at the school in which Bowman was working and was supervised by another person. (Tr. 58). Mr. Bowman stated that

13

when he supervised his son, he had to "constantly direct" him himself or have an assistant do so. (Tr. 59). He stated that he had to be very specific and to frequently redirect him. (Id.) Mr. Bowman also stated that he observed situations in which Bowman was supervised by other supervisors who also had to frequently direct Bowman. (Id.) He testified that he presently was witnessing Bowman having two seizures a week, during which he was "absent," which would range from two minutes to ten minutes with a recovery time of up to one hour. (Tr. 61). Mr. Bowman further testified that Bowman showed no initiative to do anything unless directed to do so. (Tr. 65).

A Vocational Expert also testified at the administrative hearing. The ALJ posed a hypothetical to the VE, which asked the expert to identify jobs that an individual of the claimant's age, education and past work history could perform with the following limitations:

> For the first hypothetical I want you to consider an individual that has no exertional limitations, the individual would however, never be able to climb ladders, ropes or scaffolds; and would need to avoid exposure, any exposure to any kind of workplace hazards and that would include moving mechanical parts.

(Tr. 70). Then she asked a second hypothetical, stating:

> Now, my second hypothetical is assume that same individual now add these additional limitations: The individual would be limited to simple and routine tasks not a production rate or pace; the individual could

14

tolerate occasional changes in the work setting and would tolerate occasional interaction with the public.

(Tr. 71).

Thus, the ALJ's hypothetical question to the expert did not make any reference to Bowman's need for additional supervision or for redirection in completing tasks.

### B. The ALJ's Decision

Bowman applied for disability insurance benefits on January 22, 2018, alleging an onset date of September 28, 2017. (Tr. 15). His initial application for benefits was denied on May 15, 2018. (Tr. 96-100). Thereafter, Bowman requested a hearing on June 15, 2018. (Tr. 101-02). A hearing was held on April 24, 2019 before ALJ Gwendolynn Hoover ("ALJ"). (Tr. 15). At the hearing, Bowman, his father, and a Vocational Expert testified. (Id.) By a decision dated June 5, 2019, the ALJ denied Bowman's application for benefits. (Tr. 12-28).

At the outset, the ALJ first concluded that Bowman met the insured status requirements of the Social Security Act through December 31, 2022, and that he had not engaged in any substantial gainful activity since his alleged onset date of disability, September 28, 2017. (Tr. 17). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Bowman had the following severe impairments: complex partial seizure of the frontal lobe and cognitive impairment.

(Id.) The ALJ also noted that Bowman's hypercholesterolemia, diabetes insipidus, and nocturnal enuresis did not meet the criteria for a severe impairment and considered them nonsevere. (Tr. 17-18). At Step 3, the ALJ found that none of Bowman's impairments met or medically equaled a listed impairment. (Tr. 18-19).

Between Steps 3 and 4, the ALJ fashioned a residual functioning capacity ("RFC"), taking into account Bowman's limitations from his impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functioning capacity to perform a full range of work at all exertional levels and he can never climb ladders, ropes, or scaffolds or be exposed to workplace hazards such as moving mechanical parts and high, exposed places. His mental capacity is limited to simple and routine tasks, but not at a production rate pace, and he can tolerate occasional changes in the work setting and interaction with the public.

(Tr. 19).

Specifically, in making this RFC determination, the ALJ noted the testimony of Robert Bowman but failed to state whether she found it persuasive. (Tr. 20). The ALJ found the opinions of Dr. Smith-Mitsky to be persuasive; Dr. Miller's and Dr. Fisher's opinions to be partially persuasive; the opinion of Dr. Cowan to be unpersuasive; and the opinion of CRNP McNew not valuable or persuasive. (Tr. 20-22). At no time did the ALJ mention the Neuropsychological Evaluation performed by Dr. Moran, nor does she reference Dr. Moran's finding in any manner.

Additionally, the ALJ did not mention Dr. Ciazzo's consultative examination, although this examination served as the basis underlying Dr. Cowan's opinion.

Thus, at Step 4, the ALJ found that Bowman could not perform his past relevant work as an auditing machine operator, a purchasing agent, a data entry clerk, or clerk typist (Tr. 23), but found at Step 5 that there were jobs in the national economy that Bowman could perform, including a laundry laborer, a cleaner housekeeper, and a final assembler, optical goods. (Tr. 23-24). Accordingly, the ALJ determined that Bowman was not disabled and denied his claim for benefits. (Tr. 23). Bowman requested a review of the ALJ's decision, which was denied by the Appeals Council. (Tr. 1-6). This appeal followed. (Doc. 1).

On appeal, Bowman contends that the ALJ's decision is not based on substantial evidence as required under 42 U.S.C. § 405(g) because the ALJ gave erred in failing to consider all of the limitations caused by Bowman's severe impairments; that the ALJ erred in failing to consider all of the limitations caused by Bowman's nonsevere impairments; that the ALJ erred in failing to give proper weight to the opinions of Dr. Fisher and Dr. Miller, and that the ALJ erred in failing to properly consider the testimony of Robert Bowman, Jr. (Doc. 15, at 1-2). For the reasons set forth below, we find that the ALJ erred in failing to consider the opinions of Dr. Moran and Dr. Ciazzo, and the testimony of Robert Bowman, Jr., and failed

to give an adequate explanation for why these opinions and testimony were discounted. Accordingly, we will order that this case be remanded for further proceedings.

## III. <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence." )(alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777

F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B.**    **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Title II of the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether

the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant."

Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a

23

finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to

show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id</u>. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

### C. <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions and Lay Testimony</u>

Bowman filed his disability application in January of 2018, following a paradigm shift in the manner in which medical opinions were evaluated when

assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations that defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court has aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the

foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id.</u> at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. <u>Id.</u> at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). <u>Id.</u> at §§ 404.1520c(b)(3), 416.920c(b)(3).

<u>Andrew G. v. Comm'r of Soc. Sec.</u>, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well established that "[t]he ALJ – not treating or examining physicians or State agency

consultants – must make the ultimate disability and RFC determinations." <u>Chandler</u>

<u>v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating

medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence

for no reason or for the wrong reason.'" <u>Morales v. Apfel,</u> 225 F.3d 310, 317 (3d

Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision

is accompanied by an adequate, articulated rationale, it is the province and the duty

of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without
crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–
00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
<u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
"SSR 96–2p does not prohibit the ALJ from crediting some parts of a
treating source's opinion and rejecting other portions"); <u>Connors v.
Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
10, 2011). It follows that an ALJ can give partial credit to all medical
opinions and can formulate an RFC based on different parts from the
different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–
00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

In addition to an assessment of the medical opinion evidence, the ALJ must

also evaluate lay testimony provided by third parties, such as Bowman's father, and

make credibility determinations. An ALJ's findings based on the credibility of a

claimant are to be accorded great weight and deference, since an ALJ is charged with

the duty of observing a witness' demeanor and credibility. <u>Frazier v. Apfel</u>, No. 99-CV-715, 2000 WL 288246, at *9 (E.D. Pa. Mar. 7, 2000) (quoting <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997)). When evaluating such evidence "ALJs should consider 'such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence' when evaluating evidence from non-medical sources such as family or friends." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 612 (3d Cir. 2014) (quoting SSR 06–03p, 2006 WL 2329939, at *1 (Aug. 9, 2006)). Moreover:

> To properly evaluate these factors, the ALJ must necessarily make certain credibility determinations, and this court defers to the ALJ's assessment of credibility. See <u>Diaz v. Comm'r</u>, 577 F.3d 500, 506 (3d Cir. 2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. <u>Adorno v. Shalala</u>, 40 F.3d 43, 48 (3d Cir. 1994) (citing <u>Stewart v. Sec'y of Health, Education and Welfare</u>, 714 F.2d 287, 290 (3d Cir. 1983) ); <u>see also</u> <u>Stout v. Comm'r</u>, 454 F.3d 1050, 1054 (9th Cir. 2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony").

<u>Zirnsak</u>, 777 F.3d at 612 (emphasis added).

On this score, courts have reasoned that the testimony of lay witnesses, and specifically family members, can be of particular value. <u>See e.g.</u>, <u>Smolen v. Chater</u>,

80 F.3d 1273, 1289 (9th Cir.1996); <u>Markoch v. Colvin</u>, 2015 WL 2374260, at *13

n.4 (M.D. Pa. May 18, 2015); <u>Escardille v. Barnhart</u>, 2003 WL 21499999 (E.D. Pa.

Jun. 24, 2003); <u>Cowart v. Comm'r of Soc. Sec.</u>, 2010 WL 1257343 at *8–9 (E.D.

Mich. Mar. 30, 2010). Accordingly, a failure to consider such testimony runs afoul

of the rule that when assessing third party reports, "the ALJ must specifically

identify and explain what evidence he found not credible and why he found it not

credible." <u>Zirnsak</u>, 777 F.3d at 612 (citations omitted).

Thus, in this setting an ALJ's burden of articulation includes a responsibility

to acknowledge, address, and analyze, third-party disability reports and testimony.

### D. <u>The ALJ's Determination Is Not Supported By Substantial Evidence.</u>

As we have noted, an ALJ's decision must be accompanied by "a clear and

satisfactory explication of the basis on which it rests." <u>Cotter</u>, 642 F.2d at 704.

Furthermore, the ALJ must also "indicate in his decision which evidence he has

rejected and which he is relying on as the basis for his finding." <u>Schaudeck</u>, 181 F.3d

at 433. This cardinal principle applies with particular force to several types of

assessment made by ALJs. As it pertains to Bowman's case, it is well-settled that

"[t]he ALJ must consider all relevant evidence when determining an individual's

residual functional capacity." <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 41 (3d Cir. 2001).

Therefore, an ALJ must "explain his reasons for discounting all of the pertinent

evidence before him in making his residual functional capacity determination." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000).

Here, we find that the ALJ's assessment failed to acknowledge pertinent evidence relevant to Bowman's claim, and moreover, failed to explain why this relevant evidence was not considered in fashioning Bowman's RFC. Specifically, the ALJ failed to consider the neuropsychological evaluation performed by Dr. Moran, the consultative examination performed by Dr. Ciazzo, and the third-party testimony of Bowman's father. Moreover, the ALJ failed to explain why this relevant evidence was not considered. Accordingly, we conclude that the ALJ's assessment was not supported by substantial evidence.

At the outset, we are struck by the fact that neither the neuropsychological evaluation performed by Dr. Moran, nor the consultative examination performed by Dr. Ciazzo, were mentioned by the ALJ in her decision.[2] We recognize that this

---

[2] "Neuropsychologists provide detailed assessments of cognitive and emotional functioning that often cannot be obtained through other diagnostic means. They use standardized assessment tools and integrate the findings with other data to determine whether cognitive decline has occurred, to differentiate neurologic from psychiatric conditions, to identify neurocognitive etiologies, and to determine the relationship between neurologic factors and difficulties in daily functioning." Neuropsychological Evaluations in Adults. Ryan W. Schroeder, Psyd; Phillip K. Martin, Phd; And Anne Walling, Mb, Chb, University of Kansas School of Medicine–Wichita, Wichita, Kansas, *Am Fam. Physician.* 2019 Jan 15.

medical testing was performed in 2016, prior to the alleged onset date of disability, and an ALJ "is not obligated [to] find evidence prior to the onset date to be relevant or probative." McKean v. Colvin, 150 F.Supp.3d 406, 414 (M.D. Pa. 2015) (citing Giese v. Comm'r of Soc. Sec., 251 F. App'x 799, 804 (3d Cir. 2007)). However, "the mere fact that evidence exists prior to disability onset does not automatically mean that such evidence is not relevant, nor does it relieve an ALJ of the duty to explain why evidence predating the onset date would not be afforded substantial weight." Id. (citing O'Donnell v. Astrue, 2011 WL 3444194, at *7 n. 7 (W.D. Pa. Aug. 8, 2011)).

In the instant case, Dr. Moran was noted to be a neuropsychologist,[3] which by definition is a specialist in the assessment of cognitive disabilities and behavioral deficits. The evaluation performed by Dr. Moran was a comprehensive set of more than one dozen tests, performed over the course of 2 days and over an eight-hour period. (Tr. 470, 473). Dr. Moran opined that there was no evidence of executive dysfunction on measures but found that "it would appear that there are behavioral issues associated with the brain injury at 14 and consequent current bifrontal

---

[3] Neuropsychology is "A specialty of psychology concerned with the study of the relationships between the brain and behavior, including the use of psychological tests and assessment techniques to diagnose specific cognitive and behavioral deficits and to prescribe rehabilitation strategies for their remediation.

encephalomacia." (Tr. 473). Accordingly, Dr. Moran opined that Bowman would do best in a structured environment, as he showed susceptibility to interference, and it was reported that he had anger and irritability outbursts and difficulty completing tasks. (Id.)

While this testing occurred prior to the alleged onset date of disability, the ALJ did not explain how this evidence from a neuropsychologist, which opined as to the claimant's cognitive and behavioral functioning, was not relevant or probative to Bowman's claim that his cognitive impairments prevented him from working. In fact, this medical evidence is not mentioned in any part of the ALJ's decision. Accordingly, the ALJ's failure to adequately explain why she discounted this medical evidence requires us to remand this case for further consideration.

The ALJ's error in failing to address Dr. Moran's evaluation is compounded by the fact that the ALJ failed to consider the consistency of Dr. Moran's findings with the testimony of Robert Bowman, Jr. Because Mr. Bowman was in a unique position to have been able to observe his son in both a home setting and a work setting, his testimony had probative value. See e.g., Smolen, 80 F.3d 1273; Markoch, 2015 WL 2374260; Escardille, 2003 WL 21499999; Cowart, 2010 WL 1257343. He testified that in a work setting, Bowman could not perform unless he was given instruction in great detail and was monitored in the performance of his tasks. (Tr.

56-58). Mr. Bowman further testified that his son showed very little if any initiative either in a home or work setting. (Tr. 59). On this score, Dr. Moran observed that over the course of testing Bowman he did not initiate interaction and was restless during the testing, and based in part on those observations, Dr. Moran opined that Bowman would require a structured work environment. (Tr. 473).This finding appears to be consistent with and supported by the testimony of Mr. Bowman that his son required a structured environment and constant supervision in order to complete tasks.

Because Dr. Moran was able to make an assessment of Bowman's cognitive abilities based upon a thorough examination and two periods of observation of four hours, and because she was specifically trained to assess cognitive abilities, we conclude that Dr. Moran's opinions would seem to be highly probative and highly relevant. Moreover, her findings were based on the results of a number of recognized objective tests. These tests were the only objective tests in the record, with the exception of Dr. Ciazzo's single WAIS test, and the EEG performed in 2008 which revealed frontal cortex injuries. Further, the testimony of the claimant's father seemed to support Dr. Moran's findings that Bowman needed a structured environment because he was susceptible to interference. Accordingly, given that the

ALJ did not mention any of these tests or Dr. Moran's findings, we cannot conclude that the ALJ's decision was based on substantial evidence.

The ALJ also failed to consider the consultative examination performed by Dr. Ciazzo in 2016. As we have noted with respect to Dr. Moran's evaluation, this opinion was rendered prior to the onset date of disability. Dr. Ciazzo found Bowman's attention and concentration to be mildly impaired and his memory skills intact. (Tr. 407). Dr. Ciazzo opined that Bowman's insight and judgement were fair. (Tr. 407-08). Dr. Ciazzo administered a Weschler Memory Test and noted that scores in the assessed memory areas were all average. (Tr. 408-09). Ultimately, while Dr. Ciazzo opined that these scores did not suggest a neurocognitive disorder, "his seizures, blackout spells, and verbal outbursts may be more attributable to symptomology of seizures rather than brain injury." (Tr. 409). This examination was not mentioned in the ALJ's opinion. Accordingly, it appears there were two objective assessments of Bowman that opined as to his behavioral outbursts and need for structure, yet the ALJ failed to consider these opinions or explain why she thought these opinions were not relevant or probative. More is required here.

As we have noted, it is axiomatic that an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence

35

he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck</u>, 181 F.3d at 433. Here we find that the ALJ failed to address the findings and opinions of Dr. Moran with regard to Bowman's need for supervision and structure. She also failed to explain why she did not consider the opinions of Drs. Moran and Ciazzo. Moreover, the ALJ's failure to address this evidence resulted in deficiencies in the manner in which the ALJ assessed the credibility and testimony of Bowman's father. Thus, in the instant case, we conclude that the ALJ's decision is not supported by substantial evidence. Accordingly, we will remand the case to the Commissioner for further consideration.

Because the Court has found a basis for remand on these grounds, we need not address Bowman's remaining arguments. To the extent that any other error occurred, it may be remedied on remand. Finally, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.   <u>Conclusion</u>

Accordingly, IT IS ORDERED that Bowman's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is VACATED, and this case is remanded to the Commissioner

to conduct a new administrative hearing pursuant to sentence four of 42 U.S.C. §

405(g) and 42 U.S.C. § 1383(c)(3).


Submitted this 1st day of June, 2021.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge
